**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT MOSES, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FRANKLIN BSP REALTY TRUST, INC., RICHARD J. BYRNE, JEROME S. BAGLIEN, and MICHAEL COMPARATO,<br><br>Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Robert Moses ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Franklin BSP Realty Trust, Inc. ("FBRT", or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial

1

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. [1]

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded FBRT securities between November 5, 2024 and February 11, 2026, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendant's violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

---

[1] Unless otherwise stated, all emphasis is added and internal citations are omitted.

**PARTIES**

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased FBRT securities during the Class Period and was economically damaged thereby.

7.      Defendant FBRT's principal executive offices are located at 1 Madison Ave, New York, New York 10010. FBRT is incorporated in Maryland. The Company's common stock trades on the New York Stock Market (the "NYSE") under the ticker symbol "FBRT".

8.      Defendant FBRT describes itself as a real estate investment trust ("REIT") that "originates, acquires and manages a diversified portfolio of commercial real estate debt secured by properties located in the United States."

9.      Defendant Richard J. Byrne ("Byrne" served as the Company's Chief Executive Officer until February 10, 2026, as well as chairman of the Board of Directors (the "Board") at all relevant times. Upon information and belief, he either stepped down from his role as CEO, or was effectively forced out, due to the misconduct outlined in this complaint.

10.     Defendant Jermone S. Baglien ("Baglien") served as the Company's Chief Financial Officer, Chief Operating Officer, and Treasurer, at all relevant times.

11.     Defendant Michael Comparato ("Camparato") served as the Company's President until he replaced Defendant Byrne as CEO on February 10, 2026.

12.     Defendants Byrnes, Baglien, and Comparato are collectively referred to herein as the "Individual Defendants."

13.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

    (b)    was directly involved in the day-to-day operations of the Company at the highest levels;

    (c)    was privy to confidential proprietary information concerning the Company and its business and operations;

    (d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    (e)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

    (f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

    (g)    approved or ratified these statements in violation of the federal securities laws.

14.    FBRT is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

16.    FBRT and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements
### Issued During the Class Period

17.    On November 5, 2024, before the market opened, FBRT held its earnings call for

the third quarter of 2024 (the "Q3 2024 Call").

18. Defendant Baglien made the following statement about the Company's dividend (which had been maintain at $0.355 per share of common stock):

> While GAAP and distributable earnings did not cover our quarterly dividend, *we remain confident that our dividend level accurately reflects our portfolio's long-term stabilized earnings potential and we're comfortable with the current level*.

19. The Q3 2024 Call included the following exchange between an analyst and defendants Baglien and Byrne:

> **Analyst:** And then kind of last one for me, maybe on dividend coverage. We understand the lag between repayments and originations and that flowing through to net interest income. But how long do you think it takes to redeploy your capital back into loans to the point where your DE is fully covering dividends?
>
> **Defendant Baglien:** Yes, Tom. This is really an REO story. As soon as we get the REO gone and get it back into loans, we're back at coverage. This is -- we largely expected there to be a little bit of noise in the numbers as we cycled through kind of this REO and get it sold. But we're -- we could not be more confident in the earnings power of the platform once we get through this and stabilize. The answer is we want to get there as fast as we can.
>
> Obviously, the market is going to dictate that timing as much as we are. I would have told you 70 basis points ago on the 10-year that we were going to get through it a little bit faster. Things might slow a little bit here, but we'll get through it all. We will get back there. And obviously, the goal is to get back there as soon as possible. But this is entirely an REO conversation, not a lack of investable or originate able opportunities.
>
> **Defendant Byrne**: And Tom, sorry to pile on, Mike and I talk about this every day, so we're all like-minded on this. *We and our Board set our dividend policy based on our earnings power look. And we like to look at that not over like a quarter at a time, but what the earnings power of the company is*. And so whether that takes one quarter or takes a little longer, not really a consideration. And as far as REO as well, remember, we have $350 million of cash. *We have a lot more earnings power than we're demonstrating now, and we feel confident in the level of our dividend*.

20. On February 14, 2025, before the market opened, FBRT held its earnings call for the fourth quarter of 2024 (the "Q4 2024 Call"). On December 16, 2024, FBRT had previously announced that its fourth quarter 2024 dividend payment would be $0.355 per share.

5

21. Defendant Byrne made the following statement on the Q4 2024 Call:

*While we did not reach dividend coverage this quarter, we believe that our current dividend level is appropriate given the future earnings potential embedded in our REO and non-performing loans.*

22. Defendant Baglien made the following statement on the Q4 2024 Call:

Our REO and non-performing loans will continue to impact distributable earnings in the short term. As we continue to resolve REO and put that equity back to work, we believe we could generate an additional $0.25 to $0.30 to our distributable earnings on an annual basis. *While that may take a few more quarters to fully resolve, we are confident that our earnings power is within range of our current dividend level*.

23. On July 31, 2025, before the market opened, FBRT held its earnings call for the second quarter of 2025 (the "Q2 2025 Call"). On June 11, 2025, the Company had announced that second quarter 2025 dividend would be $0.355 per share of common stock. Preliminarily, Defendant Byrne stated that Defendants "suspect the market is focused on", among other concerns, "our current dividend coverage."

24. Defendant Byrne made the following statement on the Q2 2025 Call:

Our portfolio of post-interest rate hike loan originations was 56% of our portfolio at quarter end and meaningfully ahead of our peers. This reflects how active we have been in the market over the past 2.5 years. Distributable earnings were $0.27 per fully converted share. *We believe there is a clear path to growing this to a level that supports our dividend. Jerry will lay this out in detail momentarily*.

25. Defendant Baglien made the following statement about the Company's ability to maintain the $0.355 dividend that it paid shareholders for that quarter:

FBRT reported GAAP earnings of $24.4 million or $0.21 per fully converted common share. Distributable earnings for the quarter was $29 million or $0.27 per fully converted share. *Our Board determined it was appropriate to maintain the second quarter dividend at the current level of $0.355.*

We believe there are 3 key drivers to get us to dividend coverage. *First, we plan to call several CLOs that are now past their reinvestment periods and are no longer providing optimal leverage. We believe this will generate approximately $0.04 to $0.06 per share quarterly by creating liquidity and freeing up equity in those CLOs for us to reinvest*.

6

Second, we expect to reinvest the equity currently allocated to our REO portfolio and REO financings. As we continue to sell assets and recycle that capital into new originations, *we estimate this could contribute approximately $0.08 to $0.12 per share per quarter to distributable earnings.*

*Third and lastly, we expect the contribution from NewPoint to grow meaningfully over time. Once it begins to reach scale on origination volume, BSP loan servicing is integrated, and we realize the cost savings from the platform synergies, we believe NewPoint can deliver an 8% ROE or better, and that would generate approximately $0.08 per share in quarterly earnings contribution.*

26. On October 30, 2025, FBRT held its earnings call for the third quarter of 2025 (the "Q3 2025 Call"). On September 15, 2025, the Company had announced that its third quarter 2025 dividend would be $0.355 per share of common stock.

27. Defendant Baglien made the following statement on the Q3 2025 Call:

*In regards to the dividend under coverage, the key drivers we outlined last quarter to move toward coverage remain intact, and I'll highlight some of the progress we've made on those fronts*. At the end of the third quarter, we issued an approximately $1.1 billion CRE CLO, which settled on October 15. The transaction carries an initial advance rate of 88% and a weighted average interest cost of SOFR plus 1.61%, before accounting for discount and transaction costs. The CLO has a 30-month reinvestment period, meaning it should be an accretive liability for us for 3 to 5 years.

In conjunction with the new CLO, we also financed approximately $500 million of assets with the money center bank. Together, these financings allowed us to call several older CLOs, generating roughly $250 million of cash and reduce our financing cost by about 65 basis points. Combined, these transactions are expected to add an incremental $0.05 to $0.07 per share of quarterly earnings once this cash is deployed into new assets.

We expect to begin realizing this benefit in early 2026.

Mike will provide more details on our REO portfolio, but we did reduce our REO balance this quarter through an additional asset sale. We continue to sell REO and redeploy that capital into new originations. *We estimate this activity can contribute approximately $0.08 to $0.12 per share per quarter to distributable earnings over time. We also saw a strong contribution from NewPoint in its first full quarter as part of FBRT, generating $9.3 million of distributable earnings or $0.09 per fully converted share.*

28. Defendant Comparato made the following statement on the Q3 Call:

Finally, I'll spend a minute on NewPoint. The acquisition of NewPoint has made us one of, if not the largest middle market lenders in the country with over 300 employees. *We are*

*extremely encouraged by the origination activity we saw in the third quarter. We are already seeing meaningful cross-selling and collaboration between the platforms and my confidence and conviction in the acquisition continues to grow.*

As we have spent more time with the company, it is clear that we have some of the most talented people in the industry, including, but not limited to, Jerry Borger, our President of Agency Lending; Rob Rozak, the President of Affordable; and Eric Lindauer, our Head of Healthcare and FHA Lending. These leaders are bringing new products to our platform and give us yet another offering to our clients from what we've already believed to be a market-leading product offering. This is truly just the beginning of what NewPoint can bring to FBRT.

As Rich mentioned, the third quarter was very much a construction zone for FBRT. *We are now highly focused on playing offense. Our integration plan with NewPoint is on track, and we firmly believe FBRT has more tailwinds than headwinds. We are excited to continue the path to dividend coverage*.

29.     The statements contained in ¶¶ 18, 19, 21, 22, 24, 25, 27, and 28 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. FBRT's dividend was core to its operations because a steady dividend yield was material to its investors, and a growing or steady dividend is the primary reason for investors to invest in REITs. Thus, senior management had access to and monitored the truthful information about FBRT's dividend sustainability and FBRT's operations, when they made the false and misleading statements herein. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants recklessly overstated Franklin BSP Realty Trust's prospects; (2) Defendants recklessly overstated Franklin BSP Realty Trust's ability to maintain the $0.355 dividend; and (3) as a result, Defendants' statements about Franklin BSP Realty Trust's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

8

30. On February 10, 2026, after the market closed, the Company issued a press release entitled "Franklin BSP Realty Trust Announces Leadership Transition." It stated that the Company "announced that the Board of Directors of the Company has appointed Michael Comparato, currently the Company's President, as Chief Executive Officer and Brian Buffone as President, effective immediately. Richard Byrne will continue as Chairman of the Board of Directors."

31. On this news, FBRT stock fell 0.97% on February 11, 2026.

32. On February 11, 2026, after the market closed, the Company issued a press release entitled "Franklin BSP Realty Trust, Inc. Announces Fourth Quarter and Full Year 2025 Results" (the "Q4 Release"). The Q4 Release preliminarily disclosed the following earnings, showing declining business performance compared to the prior year:

> Reported GAAP net income of $18.4 million and $84.1 million for the three and twelve months ended December 31, 2025, respectively, compared to $30.2 million and $92.4 million for the three and twelve months ended December 31, 2024, respectively. Reported diluted earnings per share ("EPS") to common stockholders of $0.13 and $0.64 for the three and twelve months ended December 31, 2025, respectively, compared to $0.29 and $0.82 for the three and twelve months ended December 31, 2024, respectively.

33. The Q4 Release quoted Defendant Comparato as stating the following about the Company's business performance, during which he also announced a dividend cut:

> 2025 was a year of transition for FBRT. We have diversified our business lines with the NewPoint acquisition and we have been sorting through the remaining legacy 2021 and 2022 assets. ***While we have managed through the credit cycle with minimal losses, it has taken longer to resolve and sell the real estate than we originally planned. This has led to over-distributing capital to investors***. ***In order to stabilize our book value and match the earnings power of our company to distributions, our Board reset the quarterly dividend to $0.20***. Our earnings power to support a meaningfully higher dividend remains unchanged, and the team is working tirelessly to position us for higher earnings. In the near term, our priority is delivering durable book value growth and matching our yields to our distributions.

34. On February 12, 2026, before the market opened, the Company held its earnings Call for the fourth quarter of 2025 (the "Q4 2025 Call").

35. Defendant Comparato disclosed the following on the Q4 2025 Call:

Now on to the company. *For several quarters, we have discussed our earnings under covering our dividend. After a thoughtful analysis, we decided it was no longer prudent to sacrifice book value to pay that dividend. Accordingly, management has recommended and the Board has approved a reset of the quarterly dividend to $0.20 per common share beginning the first quarter of 2026. The company continues to have earnings power to support a meaningfully higher dividend than $0.20*. That has not changed. But in the near term, rather than returning capital to shareholders by over distributing, we want to stabilize our book value and better match our current earnings to our dividend.

Our priorities are sustainable dividend coverage, book value growth and building more consistent durable earnings. The dividend reset is driven by several factors. The recent declines in SOFR, the timing of our originations and repayments and the overall size of our loan portfolio has impacted short-term returns. In addition, spreads are at multi-decade tights, which means that new loans coming into the portfolio are generally making lower returns than loans that are paying off. REO liquidations are taking longer than originally anticipated, keeping equity locked in underperforming investments.

36. On this news, the price of FBRT stock fell $1.44 per share, or 14.18%, to close at $8.71 on February 12, 2026.

37. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and the other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

38. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired FBRT securities publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their

10

legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

39. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

40. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

41. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

42. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

43. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

44. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- as a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

45. Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

46. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

47. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48. This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

49. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to

disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

50. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

51. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

52. Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class,

or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

53. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

54. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

55. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

56. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

57. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

58. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practices.

59. As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

60. Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

61. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c) awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 26, 2026               **THE ROSEN LAW FIRM, P.A.**

/s/ Phillip Kim
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*